## In re Agency of Transportation

[596 A.2d 358]

No. 90-299

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed July 12, 1991

*Jeffrey L. Amestoy*, Attorney General, and *Scott A. Whitted*, Assistant Attorney General, Montpelier, for Plaintiff-Appellant.

*Stephanie J. Kaplan*, Executive Officer, and *Aaron Adler*, Assistant Executive Officer, Montpelier, for amicus curiae Environmental Board.

**Morse, J.** We are asked if a highway necessity determination in superior court may be modified under Act 250 with respect to cattle passes. The Agency of Transportation (AOT) appeals an Environmental Board decision requiring it to install, as part of a highway improvement project, a larger cattle pass than was found necessary at a superior court condemnation proceeding. We affirm.

## I.

AOT filed a necessity petition in the superior court, 19 V.S.A. §§ 504–510, to condemn land for proposed improvements to Route 2 east of Danville. The petition included a proposal to install a 5′ wide, 6′3″ high, and 98′ long cattle pass under the highway to allow Harold and Catherine Beattie, who own a farm situated on both sides of the road, to move cattle between the barn and fields. In October 1987, the superior court granted AOT's petition in all respects. Neither the Beatties nor any other party appealed the court's decision, and only a portion of the record of that proceeding is before us.

The highway project was subject to Act 250 jurisdiction because it involved more than ten acres of land, 10 V.S.A. § 6001(3), and District Environmental Commission #7 issued AOT a land use permit for the project. The Commission found that a widened road would create a hazard when equipment moved across it and accepted the need for a cattle pass. The Commission determined that the Beatties crossed Route 2 with their farm equipment and cattle approximately 1100 times per year. Roughly 45 out of a total herd of 100 cattle were milked at any given time and crossed Route 2 twice daily. The busiest time of the farming year coincided with the tourist season of mid-June through the foliage season.

The Commission also found that an underpass of the size AOT proposed would be difficult to maintain, the passage being

so narrow that injured animals and manure would have to be removed by hand. Based on the number of annual crossings and the relatively slow speed of the farm equipment compared to traffic on Route 2, the Commission issued a permit requiring AOT to submit plans for a cattle underpass that was to be at least twelve feet wide at the bottom and thirteen feet high, which it found to be the minimum size necessary to accommodate the Beatties' farm equipment. The Commission retained jurisdiction over the project to review AOT's placement of traffic-warning signs, speed-limit signs, and traffic-control programs, and reserved the right to impose further conditions with respect to them. AOT appealed the Commission's decision to the Board. None of the parties challenged the findings of fact. The Board accepted the Commission's findings of fact without a de novo hearing and issued conclusions of law. AOT now appeals the Board's rulings to this Court.

## II.

AOT contends that 19 V.S.A. § 507(b) gives the superior court exclusive jurisdiction to decide the need for and size of cattle underpasses and that therefore the Board exceeded its authority under 10 V.S.A. § 6086(a)(5) (criterion 5, traffic safety), when it increased the size of the underpass. Viewing this issue from a different perspective, AOT maintains that the doctrine of res judicata bars relitigation of the cattle pass issue. We disagree and hold that the Board was not precluded from determining the need for, and size of, the Beatties' cattle underpass under criterion 5.

In a condemnation proceeding, after finding that a taking is necessary for a proposed highway, the superior court may direct AOT to install a cattle underpass. 19 V.S.A. § 507(b). That section establishes two kinds of cattle underpasses: a standard underpass 5′ wide by 6′3″ high made of reinforced concrete, metal, or other suitable materials or a larger-than-standard underpass when required by present and future highway traffic volume, future land development in the area, and the amount and type of acreage separated by the highway. An underpass 8′ wide by 6′3″ high constructed of reinforced concrete is authorized if a herd of greater than fifty milking cows is consistently maintained on the property.

In a case where a larger-than-standard underpass is ordered, the farm owner is required to pay one-fourth of the difference in the overall cost between the standard underpass and the larger one. If the owner of the farm property desires an underpass of dimensions greater than 8′ wide by 6′3″ high, "the underpass may be constructed if feasible and in accordance with acceptable design standards," and the entire additional cost is incurred by the farm owner. 19 V.S.A. § 507(b). In this case, the superior court found that the standard underpass, 5′ wide by 6′3″ high, would be sufficient, but we do not know how or upon what evidence the court reached its decision because the record is not before us.

Under Act 250, state development projects involving more than ten acres of land require a land use permit. 10 V.S.A. § 6001(3). Under criterion 5, the Board or the Commission must find that the subdivision or development "[w]ill not cause unreasonable congestion or unsafe conditions with respect to use of the highways, waterways, railways, airports and airways, and other means of transportation existing or proposed." 10 V.S.A. § 6086(a)(5). A permit cannot be denied for a project that creates unsafe conditions within the meaning of criterion 5, but permit conditions can be imposed to remedy those conditions. 10 V.S.A. § 6087(b).

 AOT maintains that these two legislative schemes—both dealing with traffic safety—conflict with each other and argues that rules of statutory construction must be applied to resolve the conflict. We disagree, however, with AOT's premise that the statutes are in conflict.

 Section 507(b), dealing with the necessity of cattle underpasses in condemnation proceedings, is narrowly drawn. The court may only "direct the agency of transportation to install passes under the highway as specified in this chapter *for the benefit of the large modern farm properties* . . . where a reasonable need is shown by the owner." 19 V.S.A. § 507(b) (emphasis added). Thus, § 507(b) is intended to benefit owners of farms by fully subsidizing the cost of standard underpasses and partially subsidizing the cost of larger ones. The Legislature recognized that larger farms ("large modern farm properties") may need larger-than-standard underpasses and provided a mechanism for their installation on a shared-expense basis.

.

■ In necessity proceedings, the determination of an underpass size is restricted by the farm owner's willingness and ability to contribute to the cost. A larger underpass is considered only if the farm owner has demonstrated a desire and reasonable need for one, not because environmental considerations dictate that a larger underpass is in the public good. In Act 250 proceedings, underpass size is solely a traffic safety issue. Once an underpass is deemed necessary for environmental reasons, the farm owner's need and financial contribution are not critical in determining its size.

■■ We have recognized that Act 250, although not applicable to all development, is broad legislation designed to preserve the state's environment. *In re Hawk Mountain Corp.*, 149 Vt. 179, 184, 542 A.2d 261, 264 (1988). The Legislature provided that an Act 250 permit "shall not supersede or replace the requirements for a permit of any other state agency or municipal government." 10 V.S.A. § 6082. Section 6082 makes plain that a less stringent Act 250 permit may not substitute for a more stringent provision required elsewhere. On the other hand, a less stringent provision required elsewhere does not preclude stricter Act 250 review. The corollary of § 6082 is found in § 6086(d), allowing the Board to give presumptive effect to permits and approvals of state agencies and municipalities, but requiring independent Act 250 review. An Act 250 permit may be denied if the Board finds an ancillary approval or permit does not satisfy the environmental criteria of § 6086(a) or was, in the words of this Court, "improvidently granted." *Hawk Mountain*, 149 Vt. at 185, 542 A.2d at 264.

■ AOT argues that this case is not affected by § 6086(d) because, in necessity determinations, approval is granted by the court, not an agency or municipality. This distinction, however, does not take into account that de novo review by courts in granting zoning permits, e.g., 24 V.S.A. § 4471 (appeal of decisions of board of adjustment to superior court), does not preclude Act 250 supervision. Act 250 itself explicitly proclaims its primacy over, without preemption of, ancillary permit and approval processes. The fact that a court is employed in giving approval has no bearing on the overall process of protecting the environment as envisioned by the legislation. *Hawk Mountain*,

149 Vt. at 185, 542 A.2d at 264 (Act 250 scheme indicates legislative intention that Environmental Board have supervisory powers in environmental regulation).

■ It follows from the varying purposes of the two legislative schemes that the doctrine of res judicata is inapplicable and that, when Act 250 requires more stringent standards than provided in an ancillary permit process, Act 250 controls.

### III.

■ We need not reach the remaining issues raised on appeal because no actual dispute between the Board and AOT has arisen. AOT challenges the authority of the Board to dictate the placement of traffic-control devices and, if the Board does have authority, it claims the Board must follow federal standards under 23 V.S.A. § 1025. Nowhere in the record, however, does it appear that the Board and AOT disagree with each other as to what devices are appropriate. This Court's power to adjudicate is limited to "'actual controversies arising between adverse litigants.'" *In re Constitutionality of House Bill 88*, 115 Vt. 524, 529, 64 A.2d 169, 172 (1949) (quoting *Muskrat v. United States*, 219 U.S. 346, 361 (1911)).

Finally, the issue over the applicability of the cost-sharing provision of 19 V.S.A. § 507(b) in the Act 250 proceeding was waived by AOT at oral argument.

*Affirmed.*