STATE OF VERMONT

SUPERIOR COURT — ENVIRONMENTAL DIVISION

|  |  |  |
|---|---|---|
| Zaremba Group Act 250 Permit Appeal | { { { | Docket No. 36-3-13 Vtec |

### Decision on the Merits

In the matter before us Shawn Cunningham, Michele Bargfrede, Cindy Farnsworth, Richard Farnsworth, Gail Gibbons, Robert Gibbons, Diane Holme, John Holme, Janice Housten, Leonard Lisai, Scott Morgan, Donald Payne, Stephanie Payne, Kathy Pellett, William Reed, Kathy Schoendorf, Claudio Veliz, Bonnie Watters, and Lew Watters (Appellants) appeal a February 27, 2013 decision by the District #2 Environmental Commission granting an Act 250 Land Use Permit amendment to Zaremba Program Development, LLC, f/k/a Zaremba Group, LLC and Theodore Zachary (Applicants or Zaremba).  This permit amendment allows Applicants to create two lots consisting of Lot 1 with 8.72 acres and an existing, permitted 3,000-square foot restaurant; and Lot 2 with 1.37 acres and the construction and operation of a proposed 9,100 square-foot retail store (the Project) all to be located at 319 South Main Street (Route 103) in the Town of Chester, Vermont (the Town).

The Court conducted a site visit at the subject property and surrounding area on the morning of September 10, 2013 followed by a three-day merits hearing at the Vermont Superior Court, Civil Division, Newfane Unit in Newfane, Vermont.[1]  Appearing at the site visit and merits hearing were Attorneys Alan P. Biederman and David R. Cooper, representing the Applicants, and Attorney James Allan Dumont, representing the Appellants.  Attorney Jon Groveman, representing the Agency of Natural Resources (ANR) attended and participated in the trial.  Attorney Peter Gill, representing the Natural Resources Board, attended the trial but did not actively participate.  Neither Attorney Groveman nor Attorney Gill attended the site visit.

A related matter, Docket No. 66-5-12 Vtec, an on-the-record appeal of a decision of the Town of Chester Development Review Board (DRB), was previously remanded by this Court in

---

[1] The parties agreed to the trial being heard in Newfane as the Woodstock courthouse was undergoing substantial renovations at the time of trial.

1

a June 12, 2013 Decision to the Town of Chester Development Review Board for clarification of its findings of fact and conclusions of law regarding Town of Chester Zoning Regulations (Regulations) § 9.4(c)(1)(B), (C) and § 9.4(c)(4)(A).

## Stipulated Facts and Exhibits

At the beginning of trial on September 10, 2013, the Applicants and Appellants filed a written stipulation seeking the admission of facts and exhibits into evidence. No party has objected to this stipulation, and therefore, we admit the following facts and referenced exhibits verbatim from the stipulation:

1. Zaremba seeks a permit pursuant to 10 V.S.A. Chapter 151 ("Act 250"), for the subdivision of an approximately 10.08 acre lot located at 319 Main Street (Route 103) in Chester, Vermont, into two lots, and the construction and operation of a 9,100 square foot retail store and associated infrastructure on the smaller, subdivided lot (the "Project").

2. Zaremba's Application for an Act 250 Permit describes the project proposed by Appellant [sic]. The Application is submitted herewith as **Exhibit 1**. The Application was submitted with numerous exhibits. Those exhibits are *not* appended to Exhibit 1. Certain of those exhibits relate to criteria that are not before the Court as they were not appealed to this Court. See Paragraphs 8 and 9 below. Other exhibits relate to the Criteria that have been appealed and will be addressed by live testimony and other exhibits.

3. The initial tenant for the new store will be Dollar General. The only data submitted as to traffic, signage and use is that of a Dollar General. For purposes of Land Use Panel Rule 34, Appellants assert that the amount of traffic, the signage, and the particular use of the site are critical issues; Appellee does not agree. For purposes of this pretrial stipulation, the parties agree to disagree on this legal issue. The general business operation of Dollar General is the sale of name brand retail goods at discount prices. Products typically sold in Dollar General stores are a mix of food and non-food items. Dollar General is not a "dollar store" in that the prices for goods sold are not limited to one dollar goods. Most products sold are sold for prices competitive with Wal-Mart, Costco, or other discount retailers.

4. On December 22, 1986, the District 2 Environmental Commission issued Land Use Permit #2S0699 (the "Original Permit"), which authorized the construction of a 3,000 square foot restaurant and associated parking areas on an approximately 10 acre parcel located

at 319 Main Street (Route 103) in Chester, Vermont. Subsequently, two amendments were issued. The Original Permit and the two amendments are submitted herewith as **Exhibit 2**.

5. Zaremba's current application seeks to amend the Original Permit.

6. On February 27, 2013, the District #2 Environmental Commission issued a Land Use Permit approving the Project. **Exhibit 3**.

7. Appellants have appealed the under [sic] the following four (4) criteria:

- Criterion 1(D) – Floodways;

- Criterion 5 – Traffic Safety and Congestion;

- Criterion 8 – Aesthetics;

- Criterion 10 – Conformance with Local and Regional Plans

8. The remaining criteria are not before the Court as they are not the subject of this appeal. The Statement of Questions before the Court reference the four criteria set forth in Paragraph 6 above [sic].

9. Engineering plans for the Project are submitted herewith as **Exhibit 4**.

10. Access to the existing Zachary's pizza restaurant on the Property is via a curb cut from South Main Street, VT Route 103.

11. As part of the Project, Appellee proposes to remove the existing curb cut and install a new access to the south. The new driveway from Route 103 will provide shared access to both the retail store and the restaurant, currently "Zachary's Restaurant."

12. The section of VT Route 103 running adjacent to the Property is controlled by the Town of Chester. Control of the roadway of Route 103 directly in front of the Project is exercised by the Town of Chester. That control changes to State control approximately 50 feet south of the property line, or 140 feet south of the entrance drive.

13. The proposed building is a front-gabled, single-story structure. Schematic plans of the proposed building, together with an artist conception of the building are submitted herewith as **Exhibit 5**.

14. The footprint dimensions of the proposed building are 70′ wide by 130′deep. The narrower dimension and the proposed façade and gable end will face South Main Street.

15. An artist conception of the aerial view of the project is submitted herewith as **Exhibit 6**. Appellants do not stipulate that Exhibit 6 is an accurate representation but do not object to its admission, with that caveat.

16. The Project's proposed hours of operation will be 8:00 a.m. until 9:00 p.m., seven days a week.

17. The parties agree that upon receipt of an affidavit from Matthew Casey or some other officer of the Appellee setting forth the expected number of employees at the store at one time during average days and also during vacation shopping times, the Court may accept that affidavit as if from a witness under oath and present for cross-examination.

18. All deliveries will occur during normal hours of operation. Trucks supplying the Project will leave the project in a forward motion i.e., will not back out onto Route 103.

19. The exterior materials will include horizontal wooden clapboard, cornice boards, corner boards and rake boards.

20. The main entrance will be centered on the front façade of the building and will have large, tinted faux windows to either side of the entry.

21. A faux hayloft style door will be placed above the main entry.

22. Wooden materials on the exterior facades of the building will be either painted or stained in neutral earth tones.

23. There will be a natural brick knee wall along the front façade.

24. The roof of the building will have a 5/12 pitch and will be metal standing seam.

25. A faux cupola will be placed on the ridgeline towards the front of the building. The Project's lighting (other than emergency lighting) will come on no sooner than ½ hour before opening and will be turned off no later than ½ hour after closing.

26. Appellee's proposed photometric plan of the Project's lighting is submitted herewith as **Exhibit 7**. All lighting will be downward facing and will be shielded downward. The proposed Plan will have zero sum lighting at the property line.

27. The Project's proposed signage is submitted herewith as **Exhibit 8**. There shall be no more than two signs for the Project. One will be wall mounted on the front of the building (the gable end). The free standing sign will have a brick base.

28. There will be no outdoor storage of products of any kind.

29. All utilities for the project will be underground.

30. There will be two 500 gallon propane tanks installed subsurface to supply the proposed building with fuel.

31. All HVAC equipment will not exceed 55 dB(A) at the Property line.

4

32. The proposed Project site is located within the Residential Commercial Zoning District.

33. The current Chester Town Plan was adopted by the Town of Chester Selectboard on July 21, 2010. **Exhibit 9**.

34. The Town of Chester has adopted a Future Land Use Map, effective Date July 21, 2010. **Exhibit 10**.

35. The Southern Windsor County Regional Commission adopted its current Regional Plan on June 16, 2009 (the "Regional Plan"). The Regional Plan is too voluminous to append hereto, but the Parties agree that the Court may take judicial notice of the Regional Plan and its contents.

36. The parties do not agree as to the admission of the expert reports of witnesses Buscher, Saladino, Rockler, Raphael and Veliz, along with their attachments. Appellants take the position that all of the reports and attachments, from all parties, should be admitted, subject to cross-examination. Appellee argues that portions of the reports are hearsay and/or inadmissible opinions on the ultimate issues before the Court. The parties will raise this for the Court to decide.

Based upon the evidence presented at trial, including that which was put into context by the site visit, the Court renders the following additional Findings of Fact.

## Findings of Fact

Floodways

37. The Project site is bordered on the southwest by Route 103 and northeast by Lovers Lane Brook.

38. The northern section of Lot 1 is located within the floodway of Lovers Lane Brook.

39. The northern section of Lot 1 and the northeastern corner of Lot 2 are located within the 100 year flood zone associated with Lovers Lane Brook.

40. The proposed building is located within the FEMA inundation flood hazard area. The building as designed, however, will be two feet above base flood elevation. This design meets the minimum National Flood Insurance Program inundation flood hazard area requirements and is consistent with the ANR "Technical Guidance for Determining Floodway Limits Pursuant to Act 250 Criterion 1(D)," updated October 9, 2009.

5

41. The Project site was flooded during Tropical Storm Irene in 2011.

42. Construction of the Project building and associated fill will result in a loss of flood water storage of 1,305 cubic yards.

43. The Project is designed, however, to include a flood mitigation cut area located in the northwestern section of Lot 1 where additional flood water storage of 2,544 cubic yards is provided. Presently in this area is an elevated berm creating a narrowing of the floodway. Construction of the mitigation cut area will remove the berm and widen the floodway.

44. Thus, the Project results in the net additional flood water storage over present conditions of approximately 1,239 cubic yards or 250,228 gallons.

45. The Project will result in two areas where the Lovers Lane Brook floodway is narrowed. The first is near the east side or rear of the Project building and the second is near the stormwater pond. Both of these areas are wider than the narrowest section of the brook in the area of the Project.

46. The Project will not alter the volume of water flowing within Lovers Lane Brook.

47. The Project includes a minimum 50 foot buffer along Lovers Lane Brook.

48. The Project will not alter or affect Lovers Lane Brook where the brook enters the Williams River.

49. Lovers Lane Brook is narrowest just south of the Project site, in the vicinity of where Lovers Lane Brook enters the Williams River.

Traffic

50. Vermont Route 103 in the area of the Project is a two-lane road with 1- to 20-foot shoulders and has a 25-miles-per-hour (MPH) posted speed limit.

51. The speed limit increases to 30 MPH east of the Project access drive.

52. Route 103 is a Vermont state highway, designated as a Class 1 Town Highway, providing connection between I-91 and points west, including the Okemo Mountain Resort.

53. In 2010 the Vermont Agency of Transportation (VTrans) recorded annual average daily traffic volume of 8,600 vehicles per day just west of the Project site.

54. The Project is projected to increase average daily traffic by 2% or approximately one additional vehicle every two or three minutes during peak traffic hours.

55. Applicants completed a traffic study for the Project following the VTrans protocol.

56.     Applicants completed peak period traffic counts at two existing Dollar General sites: 1032 Prim Road, Colchester, Vermont and 236 River Street, Springfield, Vermont.

57.     Counts were conducted on a weekday afternoon and Saturday midday.

58.     Actual traffic count data was compared to trip generation rates presented in the Institute of Transportation Engineer's (ITE) Trip Generation 8th Edition, for Land Use 820 (Shopping Center).  The actual traffic counts for the two existing Dollar General sites were higher than the ITE estimations and Applicants used the actual count data in their traffic analysis.

59.     Site-generated traffic is differentiated between primary and passby trips.  A primary trip is one where the vehicle leaves its origin to specifically visit the Project and otherwise would not have made the trip.  A passby trip is a vehicle that would drive by the Project site regardless of the presence of the Project, and once the Project is present, the vehicle turns into the site.  Passby trips create new turning movements but do not add new trips.

60.     ITE passby rates were lower than actual counts.  Applicants used the lower, more conservative, ITE passby rates in their traffic analysis.

61.     The estimated traffic for the Project, including both primary and passby trips, is a total of 71 trips (36 enter, 34 exit) for weekday p.m. Peak Hour and 92 trips (46 enter, 45 exit) for Saturday Peak Hour.

62.     The Maple Street intersection with Route 103, located approximately 0.25 miles northwest of the Project, is controlled by a traffic officer during peak ski season and during peak time periods.  This is a condition of a different Act 250 Land Use Permit associated with the Okemo Mountain Resort.

63.     Considering the worst case situation, during peak ski season, additional Project-generated traffic is projected to increase delays at the Project site and at area intersections by four seconds or less during both weekday p.m. and Saturday Peak Hour.  The greatest increase in delay, four seconds, will be experienced at the Project access point when vehicles exit the Project.

64.     During weekday p.m. Peak Hour, traffic approaches in the area function at Level of Service (LOS) C or better under current conditions.  Traffic approaches are projected at this same LOS if the Project is constructed.

7

65. The busiest traffic hour of the week is projected to be Saturday midday (Saturday Peak Hour).

66. During Saturday Peak Hour, southbound traffic at the Pleasant Street intersection with Route 103, located less than 0.25 miles southeast of the Project, experiences delays during ski season. This condition will also exist following Project construction. For this intersection, the worst case approach LOS is D with or without the Project. For all other intersection approaches in the Project area, the LOS is C or better during the Saturday Peak Hour. These are acceptable levels of service pursuant to VTrans Level of Service Policy which considers LOS E unacceptable and LOS D or better to be acceptable.

67. There is a High Crash Location (HCL) at the intersection of Route 103 and Maple Street. There is no HCL at or in the immediate vicinity of the Project site.

68. Road geometry in front of the Project site is straight and flat.

69. The Project will not increase the rate of crashes.

70. During ski season, the traffic volume to roadway capacity ratio is presently 63% and is estimated to be 64% if the Project is constructed. During non-ski season these ratios are 55% and 58%.

71. Turn lane warrants analysis was conducted by the Applicants for the Route 103 and Project site access intersection. Applicant used both the Harmelink and the Kikucki and Chakroborty methodologies for unsignalized intersections. For the Saturday Peak Hour during ski season, the Harmelink analysis resulted in a warranted eastbound left-turn lane but not under any other conditions. For the other analysis, warrants for turn lanes were not met.

72. Applicants' traffic expert provided a credible opinion that peak hour Project traffic likely will not coincide with ski-related peak hour traffic.

73. Appellants currently experience heavy traffic on Route 103 during ski season.

The character of the area

74. The Project is located in the Town's Residential Commercial District. The village center, approximately 0.6 miles to the northwest of the Project, is located in the Town's Aquifer Protection District 1. The Town's Future Land Use Map designates the Project site within a Village/Mixed-Use area.

75. The Project tract is located in an area where land uses and current development transitions from a historically dense village center, northwest of the Project site, to a more

contemporary mixed-use area including less dense residential and commercial development south of the Project site. Development in the village center is somewhat interrelated and situated close to roadways. Development to the south of the village center, including the area around the Project site, is more independent and set back from roadways with individual driveways and parking lots. In the immediate area of the Project site several properties have large parking lots in front of the building and close to Route 103.

76. A sign welcoming travelers to Chester is located adjacent to Route 103 just south of the Project site.

77. The village center has sidewalks on both sides of Route 103. At the project site there is only one sidewalk on the east side of Route 103. This single sidewalk is constructed of asphalt and presently terminates at Pleasant Street, just south of the Project. The existing sidewalk is a poor means of pedestrian traffic because it is close to the road and is a poorly maintained irregular surface. The Project will replace the asphalt sidewalk with a concrete walkway having curbs along Route 103 to separate pedestrian and vehicle traffic.

78. Development along Route 103 in the area of the Project is a mixture of residential and commercial structures of varied architectural styles, sizes, and ages, with varied roof pitches, building materials, stories, and colors.

79. Several properties include outbuildings or backyard barns extending away from Route 103.

80. The Project is 35 feet high at its highest point and the size of the Project building is larger than buildings in the immediate area. There are, however, some large buildings in the area, including a hardware store. Buildings having a mass larger than the Project are also present in the area, including the American Legion, St. Joseph's Church, and a self-storage facility.

81. Views looking out from the Project site include the existing pizza restaurant immediately north and dense mature vegetation further north. There are views of a residence to the northwest across Route 103, and limited views of Route 103 itself. Across Route 103 and slightly to the south are views of two very prominently developed properties; one with the Country Girl Diner and the other with a gas station, mini market, and Vermont Liquor Outlet.

82. The pizza restaurant is contemporary with a hipped rood and large windows. The building is set back from Route 103 and has a large front parking lot. The Project includes

9

modification of the parking area to replace a portion of the asphalt with a grassed area to be used by an ongoing farmer's market.

83. The Country Girl Diner is an older stainless-steel-sided rail car with a flat roof and prominent windows. It is placed on a stationary foundation, with additions on the front and back. This property has no defined curb cut off of Route 103 and a majority of the area in front and on both sides of the building is paved for vehicular parking. There is little to no landscaping on this property.

84. The gas station, mini market, and liquor outlet is a flat-roofed multicolored building with gas pumps at the front between the building and Route 103. There is no defined curb cut off of Route 103 and the area in front and on both sides of the building is paved for vehicular traffic and parking. An overhead garage door is located on the north end of the building. Large windows are located on the front and sides of the building. These windows contain advertisements and neon signs.

85. The American Legion property, located approximately 0.7 miles south of the Project site, on the west side of Route 103, contains a large commercial building having different roof pitches, large windows facing Route 103, a cupola centered on the main roof line, and HVAC systems on the north slope of the main roof. The building, including all of these elements, is prominently visible while traveling Route 103.

86. Traveling north on Route 103 from Pleasant street to just south of the Project site an observer experiences a transition of land uses from more sporadically developed properties set back from the road to more dense homogeneously developed properties set close to the road in the village center. In this trip, viewers experience contemporary single story banks with drive-through services, a large hardware store, a historic building renovated into an art gallery, a Jiffy Mart service station, a post office, and several residential properties.

87. In the immediate area of the Project, development is vehicle oriented while the village center is more pedestrian oriented with two sidewalks provided for foot traffic.

88. The Project site does not presently appear as open space.

89. Large faux windows are planned for each side of the main entrance on the front side of the building. No other buildings in the area have faux windows.

90. The front entrance is comprised of full length glass doors.

91. No windows are provided along the sides of the building.

10

92. The Buttonwood barn, located closer to the village green, has 24 windows of various sizes. The post office in Chester has 15 windows. One bank in town has 6 windows and the other has 12. The hardware store has 5 windows.

93. Overall the Project design is intended to appear similar to a backyard barn. Other commercial buildings in the area are of similar building form, including but not limited to, a hardware store, a church, a post office, and the banks.

94. The Project will be predominantly viewed by travelers driving on Route 103, although views from neighboring properties will also be likely. Views of the Project will be more significant as one drives south on Route 103 where approximately 500 feet of roadway will have views. There will also be limited views of the Project while traveling north on Route 103.

95. Vegetation on the Project site includes both mature and immature trees. A large silver maple tree located close to Route 103 at the front of the Project site is to be maintained and trimmed to promote its health. When this tree is no longer in good health, the Town has requested that it be removed. The Project includes additional Landscaping including plantings between Route 103 and the Project parking area. Specifically, this will include planting four Apple Service Berry trees, three Amur Maple trees, and a number of Dwarf Rhododendron or similar dwarf species in front of the freestanding sign and along the edge of the parking lot. Nine additional trees, Apple Service Berry and Amur Maple, will also be planted between the Project and the existing restaurant parking area and the new farmer's market grass area. At the rear of the building, 21 8-foot minimum American Arborvitae trees will be planted. At the southern corner of the building, three additional Apple Service Berry trees will be planted in the area where a bike rack will be located.

96. Amur Maple and Dwarf Rhododendron are non-native to Vermont. Amur Maple may become unruly and amorphous as they mature. Dwarf Rhododendron is small and may be impacted by snow plowing and resulting snow banks. The Dwarf Rhododendron may also suffer in winter from exposure to salt from the highway.

97. Retaining existing vegetation along with the supplemental landscaping will decrease visibility of the Project and soften views. In the late fall and winter, with less foliage, the Project will be more visible.

11

98.     A sign is proposed to be mounted on the front of the building above the entrance.  This sign is approximately 16 inches high and 16 feet long.  A free-standing sign is to be located south of the entrance drive.  This sign is 15 feet high by 6 feet wide.  The signs will be downlit and not internally illuminated.

99.     Exterior lighting includes pole-mounted and wall-mounted full cutoff lights. Project lighting will operate only from one half-hour prior to opening and after closing.

<u>Mr. Shawn Cunningham</u>

100.    Shawn Cunningham owns and resides at property located at 3008 Popple Dungeon Road in Chester, Vermont.

101.    Mr. Cunningham's property is located approximately 4.5 miles from the proposed project.

102.    Mr. Cunningham drives past the proposed project site on a daily or almost daily basis.

103.    When driving his daughter to and from school, Mr. Cunningham drives between his home, on one side of the proposed project, and her school, on the other side of the proposed project.  During each trip, Mr. Cunningham passes and views the proposed project site.

**<u>Conclusions of Law</u>**

<u>Question 1 - Criterion 1(D) Floodways:</u>

Pursuant to Criterion 1(D) Floodways, a permit may be granted if the applicant demonstrates that:

(i)     the development or subdivision of lands within a floodway will not restrict or divert the flow of flood waters, and endanger the health, safety and welfare of the public or of riparian owners during flooding; and

(ii)    the development or subdivision of lands within a floodway fringe will not significantly increase the peak discharge of the river or stream within or downstream from the area of development and endanger the health, safety, or welfare of the public or riparian owners during flooding.

10 V.S.A. § 6068(a)(1)(D).

ANR's publication entitled "Technical Guidance for Determining Floodway Limits Pursuant to Act 250 Criterion 1(D)" (Technical Guidance), issued October 7, 2003, updated

12

October 9, 2009, is instructive in analyzing this Criterion. The document is intended to guide land development to reduce inundation and erosion hazards associated with flooding events. Appellants raised some concerns relating to the Project narrowing the Lovers Lane Brook floodway in two areas which could potentially result in increased water currents and erosion hazards. The Project will not alter the volume of water flowing within Lovers Lane Brook. Thus, if the brook channel or floodway is narrowed, the result would only be an increased flow rate. The two areas where the Lovers Lane Brook floodway will be narrowed by the Project are, however, wider than the narrowest area under present conditions. Thus, the Project will not increase the flow rate of the brook or flood events associated with the brook. Additionally, although portions of the Project are located within a floodway, the Project's minimum 50-foot buffer from Lovers Lane Brook satisfies erosion hazard concerns. Thus, most of the focus under Criterion 1(D) for the Project relates to inundation concerns.

The Project site was flooded during Tropical Storm Irene in 2011. A portion of the proposed new building is located within the FEMA inundation flood hazard area. The building as designed, however, will be two feet above base flood elevation. This design meets the minimum National Flood Insurance Program inundation flood hazard area requirements and is consistent with ANR's Technical Guidance.

Construction of the Project building and the addition of fill material to realize the acceptable elevation will result in a loss of flood water storage of 1,305 cubic yards. In order to address this loss of flood water storage, the Project is designed to include a flood mitigation cut area located in the northwestern section of Lot 1. This will create additional flood water storage of 2,544 cubic yards and therefore the Project results in the net additional flood water storage of approximately 1,239 cubic yards or 250,228 gallons. Thus, overall the Project mitigates inundation concerns by providing additional flood water storage.

Lastly, we find that the Project will not alter or affect Lovers Lane Brook where the brook enters the Williams River. We therefore conclude that the Project satisfies Criterion 1(D) as the Project will not restrict or divert the flow of flood waters, will not significantly increase the peak discharge of the river, and will not endanger the health, safety and welfare of the public or riparian owners during flooding.

Criterion 5 requires that a development "[w]ill not cause unreasonable congestion or unsafe conditions with respect to use of the highways, waterways, railways, airports and airways, and other means of transportation existing or proposed." 10 V.S.A. § 6086(a)(5). "A permit cannot be denied for a project that creates unsafe conditions within the meaning of [C]riterion 5, but permit conditions can be imposed to remedy those conditions." In re Agency of Transportation, 157 Vt. 203, 207 (1991) (citing 10 V.S.A. § 6087(b)). An opponent to a proposed development carries the burden of proof under Criterion 5 to show that the proposed development will cause "an unreasonable or adverse effect." 10 V.S.A. § 6088(b).

Applicants undertook a detailed traffic analysis for the proposed project. As noted in the factual findings, they took into consideration higher estimates based on actual traffic counts at other Dollar General stores in the state. They followed the Vermont Agency of Transportation (VTrans) protocol in assessing traffic for the Project. The estimated traffic for the Project, including both primary and passby trips, is a total of 71 trips (36 enter, 34 exit) for weekday PM Peak Hour and 92 trips (46 enter, 45 exit) for Saturday Peak Hour.

Considering the worst case situation, during peak ski season, additional Project-generated traffic is projected to increase delays at the Project site and at area intersections by four seconds or less during all peak hours. The greatest increase in delay, four seconds, will be experienced at the Project access point when vehicles exit the Project Site.

Under current conditions, the area intersections function at Level of Service (LOS) C or better. Applicants project this same LOS if the Project is constructed. During Saturday Peak Hour, southbound traffic at the Pleasant Street intersection experiences delays during ski season. The Project will not significantly alter these preexisting delays. For this intersection, the worst case approach LOS is D without or with the Project. For all other intersections in the Project area, the LOS is C or better during the Saturday Peak Hour. These are acceptable levels of service pursuant to VTrans Level of Service Policy which considers LOS E unacceptable and LOS D or better to be acceptable.

During ski season, the ratio of traffic volume to roadway capacity is presently 63% and is estimated to be 64% if the Project is constructed. During non-ski season these ratios are 55% and 58%. Turn lane warrants analysis was conducted by the Applicants for the Route 103 and Project site access intersection. Applicant used both the Harmelink and the Kikucki and

14

Chakroborty methodologies at unsignalized intersections for determining whether turn lanes were warranted. Under the first methodology, a left turn lane in the eastbound direction was warranted at the project site only at Saturday Peak Hour during the ski season, but was not warranted during weekday Peak Hour during ski season and was not warranted at all during non-ski season. Using the second methodology, no turn lane is warranted by the project under any scenarios. Based on these analyses, the Project does not propose to include any turn lanes, and we conclude that the absence of turn lanes will not create any unsafe conditions or unreasonable congestion. Applicant's traffic expert provided a credible opinion that peak hour Project traffic likely will not coincide with ski-related Saturday peak hour traffic.

Appellants currently experience heavy traffic on Route 103 during ski season. The Project's most significant impact on traffic will be the four-second increase in delay for vehicles exiting the Project site. This delay is experienced by patrons of the Project site. While there are other intersection delay increases, they are all less than four seconds. Although there is a High Crash Location (HCL) at the Route 103-Maple Street intersection, there are no HCLs at or in the immediate vicinity of the Project site and the Project will not increase the rate of crashes.

VTrans standards, such as LOS, are instructive when analyzing a project's impact on transportation, however, we need not defer to these standards. We make an independent determination, typically with the assistance of VTrans standards, of a project's conformance with Criterion 5. In re Walmart Stores, Inc., 167 Vt. 75, 85–86 (1997) (citing In re Agency of Transp., 157 Vt. 203, 206 (1991)). Level of Service below C is generally inconsistent with Criterion 5 at intersections that are not in compact, urban areas. Id. at 86.

We conclude, based on the LOS analysis and the minimal change in used highway capacity, that the Project complies with Criterion 5 as the Project will not cause unreasonable congestion or unsafe conditions with respect to use of the highways or other means of transportation existing or proposed.

Question 3 - Criterion 8 Aesthetics:

To receive an Act 250 land use permit, an applicant must provide evidence sufficient to enable the Court to find that the proposed project "[w]ill not have an undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites or rare and irreplaceable natural areas." 10 V.S.A. § 6086(a)(8). If an applicant satisfies the initial burden of production, then the ultimate burden of proving that a project does not conform to Criterion 8 rests upon the

15

project's opponents. 10 V.S.A. § 6088(b); In re Rivers Dev., Nos. 7-1-05 Vtec and 68-3-07 Vtec, slip op. at 33 (Vt. Envtl. Ct. Mar. 25, 2010) (Durkin, J.) (citing In re Route 103 Quarry, No. 205-10-05 Vtec, slip op. at 8 (Vt. Envtl. Ct. Nov. 22, 2006) (Durkin, J.), aff'd, 2008 VT 88, 184 Vt. 283).

The cornerstone of the Criterion 8 analysis is the question: "[w]ill the proposed project be in harmony with its surroundings—will it 'fit' the context within which it will be located?" Re: Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, Findings of Fact, Conclusions of Law, and Order, at 18 (Vt. Envtl. Bd. Nov. 4, 1985).

We received no evidence of historic sites or rare or irreplaceable natural areas at the Project site or in the surrounding area. Furthermore, no assertions were made at trial that the Project as proposed will interfere with any areas of scenic or natural beauty. We therefore limit our review under Criterion 8 to the Project's aesthetic impacts.

A general analysis of aesthetic impacts can be subjective, but the former Environmental Board established a more objective two-part test, now referred to as the "Quechee test," to evaluate a project under Criterion 8. Id. at 17 (quoting Re: Brattleboro Chalet Motor Lodge, Inc., No. 4C0581-EB, Findings of Fact, Conclusions of Law, and Order (Vt. Envtl. Bd. Oct. 17, 1984)). First, we examine whether a proposed project may cause an adverse impact on the character of the area. Id. Specific considerations of adversity include the nature of the Project's surroundings, existing land uses in the area, the compatibility of the Project's design with those surroundings, the suitability of the Project's materials and colors, the locations from where the Project can be viewed, and the Project's impact on open space. Id. at 17–18. If we find an adverse impact, the Court then determines whether that impact will be "undue." Id. The Vermont Supreme Court has approved the use of the Quechee test and we therefore employ it here. In re Rinkers, Inc., 2011 VT 78, ¶ 9, 190 Vt. 567.

In their post-trial memorandum, Appellants raise the issue of whether the amendment application before the Court is barred by Act 250 Rule 34(E)—commonly known as the "Stowe Club Highlands test"— and whether principles of issue preclusion make the factual findings in the original permit binding on this Court in our consideration of the character of the area under Criterion 8. These issues were not raised within Appellants' Statement of Questions.

The Environmental Division's review in an appeal is restricted by an appellant's Statement of Questions. See V.R.E.C.P. 5(f); In re Garen, 174 Vt. 151, 156 (2002). That is, the

scope of an appeal before us only includes issues explicitly raised in each Question as well as to issues intrinsic to them. In re Jolley Assocs., 2006 VT 132, ¶ 9, 181 Vt. 190.

Here, Appellants raise the question of compliance with Criterion 8. Appellants' questions do not raise the issue of Act 250 Rule 34(E) or issue preclusion, nor are these issues intrinsic to any of the questions in Appellants' Statement of Questions. Therefore, we do not consider the questions of whether Applicants' most recent applications are barred by Rule 34(E) or issue preclusion.[2]

### a. The character of the area.

When considering the Project's aesthetics impacts, the baseline "character of the area" includes existing buildings, roadways, and other nearby developments. As specified in the above facts, the area of the Project is a mixture of residential and commercial structures of varied architectural styles, sizes, and ages, with varied roof pitches, building materials, stories, and colors. The land use and development patterns within the village center are different and distinct from the properties within the immediate area of the Project site. Thus, the character of the village center is not controlling with respect to our aesthetic review of the Project. It is within this context that we consider whether the Project will cause an "adverse" impact on the character of the area.

### b. Whether the aesthetic impact is "adverse" to the area's character.

The Project building is similar in scale, material, and form to existing buildings in the area. The building has a pitched or hipped roof. Its natural earth tone color and horizontal clapboard wood siding and brick knee wall match the appearance of other buildings in the area. Landscaping will also mitigate or soften views of the Project from Route 103 and generally decrease visibility of the building. The mass or scale of the Project, while large, is similar to a

---

[2] We note that even if we were to consider whether Rule 34(E) bars consideration of this application, we would conclude it does not. The condition at issue states: "The permittee shall make no changes to the Dorand Farmhouse property and large tree in front of the property without an amendment to this permit." Charles Zachary, Land Use Permit 2S0699, Condition 15, (1986). Thus, the condition itself contemplates consideration of an amendment to this condition without requiring a showing that the elements of Rule 34(E) have been met. Furthermore, our Supreme Court has stated that issue preclusion is not the correct framework in which to evaluate applications for permit amendments. In re Stowe Club Highlands, 166 Vt. 33, 36–37 (1996).

few other buildings in the area. The Project's building mass is undifferentiated which is unlike other large buildings in the area.

Views of the Project building while traveling north on Route 103 are fairly limited in duration and occur through small openings in vegetation. Views of the Project while traveling south on Route 103 are also brief but will be fairly open. Presently, these views include the pizza restaurant and parking lots. These views are softened by vegetation. Supplemental landscaping will further soften views.

The Project's building has no windows along its northern side, which is visible traveling south on Route 103. The faux windows at the front of the building are also visible. The Building's copula is located off-center toward the front and closer to Route 103.

Neighbors to the Project testified as to their concern that the Project building is "different" or "dramatically different" from other buildings in the area. Diane Holme owns a property on Putnam Hill Road that overlooks the project. She believes that the Project looks like a warehouse and that Project lights might add a glow to the area.

Claudio Velize rents space just south of the Project at 183 Main Street where he lives and has office space. Mr. Velize is an architect specializing in commercial and residential design. Mr. Velize believes that the existing gas station mini market, hardware store, and banks do not 'fit' the area. To him, the County Girl Diner is unique to American history, and therefore, the diner does not offend him. Mr. Velize testified to the presence of large buildings in the area, some larger than the Project, and to how these existing structures have commonality and integrate with neighboring properties. He also pointed out several large structures as having telescoping elements to their design so their large mass is visually broken up. Mr. Velize provided a photographic tour of all buildings within the area. Mr. Velize takes issue with several features of the Project building, including, but not limited to, the faux windows, the off-center copula, the full height glass front doors, the building's mass, and the location of parking at the front of the lot. Mr. Velize did acknowledge that Town regulations, including front and side setback requirements and the requirement that site coverage can not exceed 35%, make it difficult if not impossible to develop the site to match development in the village center.

Shawn Cunningham testified to the proposed structure's large mass and lack of windows. He noted other large structures in the area, reviewed the number and details of

windows in those structures, and concluded that the proposed structure has too few windows and therefore does not fit the area.

Richard Farnsworth owns 4.25 acres abutting the subject site. Mr. Farnsworth testified to impacts from the existing pizza restaurant including noise from restaurant patrons, on-site traffic, and vehicle doors closing. Without foliage, the pizza restaurant is visible to Mr. Farnsworth.

David Raphael, Appellants' aesthetics expert, testified as to his review of the Project's aesthetic impacts. Due to the Project's single large unbroken mass, decrease in site vegetation and inadequate supplemental landscaping, building design, extensive setbacks, and alterations to green space, Mr. Raphael believes the Project is out of context. Mr. Raphael testified at length about how the Project is located in the "gateway" area of Chester and how although Applicants attempted to design a barn-like building, the roof is too flat, the copula is false and off-center, and the front has large faux windows, all detracting from any barn-like appearance. Mr. Raphael believes that the Project should be redesigned by reducing setbacks, increasing landscaping, and breaking up the mass of the building. In reviewing the Project area as the "gateway" to Chester, we specifically note the existing and visibly prominent gas station, mini market and liquor outlet, and Country Girl Diner directly across Route 103 from the Project site. These existing developments within the so called "gateway" are part of the context with which the Project must be compatible.

Nicolas Rockler, PhD., another of Appellants' witnesses, provided his analysis of southern Vermont retail buildings. In Mr. Rockler's analysis, he provided the average size of retail-only buildings and mixed retail and residential/lodging/restaurant buildings in towns having similar population to Chester. Mr. Rockler's conclusion was that the Project is of a scale much larger than can be found in southern Vermont towns comparable to Chester. We find Mr. Rockler's analysis of limited value as it does not consider all buildings. Rather, the analysis excludes consideration of larger buildings such as self storage facilities, commercial storage facilities, garages, and barns. One specific example excluded from the study is the Woodstock Inn. Additionally, the study reviews square footage of a building and does not review or consider volume. Lastly, the opinion does not speak to building design, shape, roof pitch, color, or materials, which are all relevant to the Criterion 8 analysis.

19

Applicants' aesthetic expert Michael J. Buscher testified to his review on potential aesthetic impacts of the Project. He provided aerial photographs, maps, and photographs of existing development in Chester in support of his review.

Given all of this, we find that the lack of windows along the building's sides, large faux front windows, and large all-glass front doors are unlike any other building in the area. The off-center cupola differs in appearance from other buildings with cupolas. Lastly, the building has a large undifferentiated mass. The Project, and especially these noted features, will be visible to travelers on Route 103. Despite the varied character of the area and the other buildings of similar size, these features do not fit the character of the area. We therefore conclude that the Project will result in an adverse aesthetic impact to the area's character.

### c. Whether the aesthetic impact is "undue," given the area's character.

Having concluded that the Project will result in an adverse aesthetic impact on the area's character, we must address whether the impact is undue and therefore in conflict with Criterion 8. 10 V.S.A. § 6086(a)(8). An adverse impact is considered "undue" if any one of the three following questions is answered in the affirmative: "(1) Does the project violate a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area?"; (2) "Does the project offend the sensibilities of the average person?"; or (3) "Has the applicant failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings?" Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, at 19–20; see also In re Rinkers, Inc., 2011 VT 78, ¶ 9, 190 Vt. 567 (applying this test).

Based upon the evidence received at trial, we conclude that the Project does not violate a clear, written community standard intended to preserve the aesthetics of the Project area. Applicants suggest that there are no clear, written community standards intended to preserve the aesthetics of the Project area. Appellants assert that the Project violates a statement within the Goals and Objectives section of the Town Plan requiring that "[a]s development pressures increase upon the Town and less densely populated areas, it is vital that the unique characteristics of the Town be preserved." (Exhibit 9, Town of Chester, Vermont Town Plan, at 4.) Leaving aside the issue of whether this provision is a clear standard intended to preserve the aesthetics of the area, we conclude that the Project will not violate this standard. The Project is located in an area with a current mix of development types and building styles. Nothing

about the Project diminishes or spoils the unique characteristics of the Town especially in the Project's immediate surroundings.

Appellants also assert that the Town Plan's Land Use chapter, specifically pertaining to the Mixed Use Village, requires that "[t]hese areas should remain as they are in character and settlement pattern" and "[n]ew development should not detract from the historic character and aesthetic qualities of the village centers." Id. at 10–11. Again, leaving aside the issue of whether this provision is a clear standard intended to preserve the aesthetics of the area, we conclude that the Project will not violate this standard. The Project matches the settlement pattern of its surrounding properties. Furthermore, the Project is immediately surrounded by more contemporary development and the Project does not detract from the historic village green and its immediate surroundings.

Lastly, Appellants offer that the Town's zoning regulations at § 9.4(c)(4) establish a clear standard intended to preserve aesthetics. Section 9.4(c)(4) applies to development within the Residential-Commercial District needing conditional use approval and requires that construction of new buildings adhere harmoniously to the "over-all New England architectural appearance" which gives the center of Chester its distinct regional character and appeal. (See Exhibit 18, Town of Chester Zoning Regulations, at § 9.4(c)(4).) Little if any evidence was offered at trial regarding the "over-all New England architectural appearance." The Project building is designed to generally imitate a "backyard barn" style and its building form matches several existing buildings in Chester. The large glass faux windows and doors at the front of the building may be in harmony with New England architecture to the extent that Mr. Velize on cross-examination could not discredit the fact that some agricultural barns in Vermont have large front glass doors. Based on the evidence before us we can not conclude the Project violates Section 9.4(c)(4). We therefore conclude that the Project does not violate any clear, written community standard.

We next conclude that the Project will not offend the sensibilities of the average person and that it will not be shocking or offensive. While neighboring Appellants testified as to how they expect the Project to be offensive and how views from specific locations may shock them, we must consider the Project's impacts from the perspective of an average person. As discussed above, there will be brief views of the Project from Route 103 and some views from neighboring properties. Under present-day conditions, there are views of the neighboring pizza restaurant

and multiple buildings of different sizes and architectural design in the Project area. The Project, and specifically the building, is similar in material and form to existing structures. Thus, we conclude that the sensibilities of the average person would not be offended or shocked by the addition of the Project.

Lastly, we conclude that the Project's design is compatible and in harmony with its surroundings. Again, although it is not an exact match to existing buildings in the area, the overall design of the Project is similar to other buildings and surrounding properties. The Project building's large front faux windows and glass doors and off-center cupola are not barn-like, however, its earth tone colors will help the building's overall appearance recede into its background and lessen the impact of these features.

Applicants have also taken reasonable steps in building design to address the context of the Project, including retaining existing vegetation and planting additional landscaping. We are concerned with the proposed Amur Maple plantings which are non-native to Vermont and may become unruly and amorphous as they mature. Additionally, the proposed Dwarf Rhododendron is another non-native plant which is small and may be impacted by snow plowing and resulting snow banks at the edge of the parking lot. The Dwarf Rhododendron may also suffer in winter from exposure to salt from the highway. We therefore require that the Amur Maples and Dwarf Rhododendron proposed in the landscaping plan be replaced with similarly functioning species that are native to Vermont. This slightly modified landscaping will mitigate or soften visibility of the Project from Route 103 and neighboring properties and decrease visibility of the building and parking lot. Modifications to the existing parking lot which reduce asphalt coverage and increase green space will help to mitigate views and the impact of the Project area as well.

There was testimony at trial concerning the lack of faux windows on any other property in Chester or any "backyard barn" that the Project is meant to imitate. There was no explanation given for why it is not reasonable to include real windows rather than fake windows. We therefore conclude that Applicants have taken reasonable, generally available mitigating steps, but we do impose a condition requiring that the Project be modified to replace the faux windows with real windows to further mitigate aesthetic impacts.

In sum, although we conclude that some of the Project's aesthetic impacts may be adverse, we also conclude that none of the aesthetic impacts will be "undue." As noted above,

22

Appellants provided considerable testimony and photographic evidence regarding their concerns, however, we are not persuaded that aesthetic impacts reach the level of being undue. See 10 V.S.A. § 6088(b) (placing ultimate burden of showing a project's nonconformance to Criterion 8 on the project's opponents). We conclude that the Project as proposed conforms to Act 250 Criterion 8.[3]

Question 4 - Criterion 10 Town and Regional Plan

Criterion 10 requires that the project proponent show that its proposal is in conformance with any duly adopted local or regional plan or capital program under 24 V.S.A. Chapter 117. 10 V.S.A. § 6086(a)(10). In making this finding, if applicable provisions of the town plan are ambiguous, the district commission or this Court, for interpretive purposes, shall consider bylaws, but only to the extent that they implement and are consistent with those provisions, and need not consider any other evidence. 10 V.S.A. § 6086(a)(10); In re Molgano, 163 Vt. 25, 30–31 (1994).

As we noted above, the Town Plan's Land Use section pertaining to the Mixed Use Village contains provisions applicable to the Project. In analyzing these Plan provisions under Criterion 8, we found that even if they evidenced a clear and specific policy, Appellants had not met the burden of showing that the Project does not conform to that policy. While similar, the analysis under Criterion 10 is different. The Applicant, rather than the Appellants, has the burden of proof under Criterion 10. 10 V.S.A. § 6088(a). In order for a Town Plan to be enforceable under Criterion 10, however, the language must be mandatory and not merely aspirational. In re Rivers Dev., LLC, Nos. 7-1-05 Vtec and 68-3-07 Vtec, slip op. at 9 (Vt. Envtl. Ct. Jan. 8, 2008) (Durkin, J.).

The Plan provisions in the Land Use-Mixed Use Village section only describe in general terms how development "should" or "is encouraged to occur." (Exhibit 9, Town of Chester, Vermont Town Plan, at 10–11.) This language is aspirational and does not create mandatory requirements. Thus, even assuming the Plan contains clear and specific policies, the Plan cannot be used to deny the project under Criterion 10. Further, as concluded above, we find that the Project does in fact comply with those policies.

---

[3] Our review in this matter is limited to Act 250 and the rules and case law relating thereto. The Town has a zoning ordinance generally regulating setbacks, height, and use, and the Town Plan speaks to certain land use planning issues. The Town has not, however, created a design review board or process allowing for more detailed design review of development proposed within the Town.

The Project also conforms with the relevant Transportation provisions in Chapter 2 of the Town Plan. These goals and policies include, but are not limited to, maintaining and expanding facilities for bicycle and pedestrian transportation, limiting new curb cuts, and minimizing impacts on current peak traffic volumes and on truck traffic in the village center. Assuming that the Transportation provisions are mandatory and not merely aspirational, we find that the Project is in line with these and other transportation provisions as it will improve the pedestrian sidewalk and include a bike rack, it will replace an existing curb cut for access serving both the existing restaurant and the Project, and it will not have an unreasonable impact on peak traffic.

We therefore conclude that the Project complies with Criterion 10 and need not consider the Town's Zoning Regulations for further interpretation of the Town Plan.

Shawn Cunningham's Standing

In a post trial motion, Applicants ask the Court to dismiss Shawn Cunningham's appeal for lack of standing under Criterion 8 and this Court's lack of subject matter jurisdiction regarding his claims. Applicants argue that Mr. Cunningham, who lives approximately 4.5 miles from the project site, fails to allege an injury to a particularized interest protected by Criterion 8, and therefore, cannot satisfy the minimum showing required for standing in this Court under Act 250. In response, Mr. Cunningham testified at trial that he drives past the proposed project site on a daily basis when driving his daughter back and forth between their home and her school, on opposite sides of the project site. Mr. Cunningham further testified that due to this drive he regularly views the proposed site two or more times per day. In his opposition to Applicants' motion, Mr. Cunningham argues that there is no evidence that other members of the public share this level of exposure to the proposed development.

**Standard for Standing**

Whether a party has standing affects this Court's subject matter jurisdiction. Bischoff v. Bletz, 2008 VT 15, ¶ 15, 183 Vt. 235. As such, we review the pending motion under the standard of review afforded by Rule 12(b)(1) of the Vermont Rules of Civil Procedure, which governs motions to dismiss for lack of subject matter jurisdiction. In re Goddard College Conditional Use, No. 175-12-11 Vtec, slip op. at 1 (Vt. Super. Ct. Envtl. Div. July 5, 2012) (Walsh, J.). Therefore, we accept as true all uncontroverted factual allegations and construe them in the

light most favorable to the nonmoving party (here, Shawn Cunningham). Id.; see also Rheaume v. Pallito, 2011 VT 72, ¶ 2, 190 Vt. 245. This Court has also recognized that "a party's standing or party status may be raised at any time." 114 Coll. St. Permit Amendment, No. 227-09-06 Vtec, slip op. at 2 (Vt. Envtl. Ct. Dec. 14, 2007) (Wright, J.).

To have standing in this Court as a "person aggrieved" by a district commission decision, an appellant must allege "an injury to a particularized interest" protected by Act 250 that is attributable to the decision and that can be redressed. 10 V.S.A. § 8504(a) and § 8502(7). Thus, our inquiry involves the elements of standing articulated by the United States Supreme Court and adopted by the Vermont Supreme Court. In re Champlain Marina, Inc., Dock Expansion, No. 28-2-09 Vtec, slip op. at 5 (Vt. Envtl. Ct. July 31, 2009) (Durkin, J.); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (setting forth the federal standing requirements); Hinesburg Sand & Gravel Co., Inc. v. State, 166 Vt. 337, 341 (1997) (adopting the federal standing requirements).

First, Mr. Cunningham must demonstrate that he has an interest protected by Act 250 that is particular to him, rather than a general policy concern shared with the public. In re Pion Sand & Gravel Pit, 245-12-09 Vtec, slip op. at 7 (Vt. Super. Ct. Envtl. Div. July 2, 2010) (Durkin, J.). An interest may be particularized even if it is shared with multiple members of the general public. In re McLean Enters. Corp., No. 2S1147-1-EB, Mem. of Decision at 7 (Vt. Envtl. Bd. Sept. 19, 2003) (noting the irrelevance of other individuals being similarly affected by a development as long as the impacts on the parties are "particular to them, concrete, and [are not impacts] affecting the common rights of all persons"). Second, Mr. Cunningham must show a reasonable possibility that the district commission decision on the proposed project may affect his particularized interest. In re Bennington Wal-mart Demolition/Constr. Permit, 158-10-11 Vtec, slip op. at 9–10 (Vt. Super. Ct. Envtl. Div. Apr. 24, 2012) (Walsh, J.) (noting that "a party need only refer to evidence that demonstrates a non-speculative causal connection between the proposed project and [his or her] particularized interests") (quoting In re Granville Manufacturing Co., Inc., No. 2-1-11 Vtec, slip op. at 6 (Vt. Super. Ct. Envtl. Div. July 1, 2011) (Durkin, J.) (internal quotations omitted)). We have specifically rejected the application of any "heightened evidentiary standard, more akin to a merits review" when considering a party's standing. Id. at 10 n. 5. Finally, we note that the parties do not dispute whether any injury Mr. Cunningham may experience could be redressed by a favorable decision.

25

Guided by these requirements, we consider whether Mr. Cunningham has standing under Criterion 8 (impacts upon scenic or natural beauty, aesthetics, historic sites, or rare and irreplaceable natural areas). We note that as a Chester resident, Mr. Cunningham has standing under Criterion 10 (conformance with Town Plan), and Zaremba does not dispute this. See Bennington Wal-mart Demolition/Constr. Permit, 158-10-11 Vtec, slip op. at 16 (finding standing exists under Criterion 10 for any plaintiff that is a resident of the town in which proposed development will be located). Mr. Cunningham has not argued that he has standing under any criteria other than 8 and 10.

### Criterion 8

Zaremba limits its motion to Mr. Cunningham's lack of standing under Criterion 8. Criterion 8 provides that prior to approving a project, the district commission must find that it "[w]ill not have an undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites or rare and irreplaceable natural areas." 10 V.S.A. § 6086(a)(8). Standing may be conferred where a plaintiff establishes that they "use" the area that may be affected and will therefore "directly" experience an alleged lessening of the "aesthetic and recreational values" of the area. Sierra Club v. Morton, 405 U.S. 727, 735 (1972); see Lujan, 504 U.S. at 562-63. Thus, while "generalized harm to the forest or the environment" will not alone support standing, if that harm in fact affects the "recreational, or even the mere esthetic interests" of the plaintiff, that will suffice. Summers v. Earth Island Inst., 555 U.S. 488, 494 (2009) (suggesting that allegations that plaintiff's organizational member had visited subject site, had imminent plans to do so in the future, and would experience harm to his viewing of flora and fauna would have been sufficient for standing); see In re Champlain Marina, Inc., Dock Expansion, No. 28-2-09 Vtec, slip op. at 6 (Vt. Envtl. Ct. July 31, 2009) (Durkin, J.).

Mr. Cunningham has testified that during the course of his daily activities as a Chester resident, he regularly views the proposed project site and the surrounding area. Mr. Cunningham resides within the same town as the project site, approximately 4.5 miles away, and makes regular trips past the site when driving his daughter between their home and her school. This, however, is not sufficient to establish that Mr. Cunningham has a particularized interest in the aesthetic character of the project site. Mr. Cunningham does not drive by the project site in order to take advantage of the aesthetic beauty of the area; he drives by because the public highway connects his home and his daughter's school. He therefore has no

particularized interest in the aesthetic character of the project site; his interest is the same as any person who happens to drive this section of Route 103 on a regular basis. Simply driving by a development project as part of a daily routine is not the same as the use of an area that creates a particularized interest in the aesthetic character of that area, such as hiking, fishing, boating, picnicking, or the like. Although Criterion 8 provides a broad protection against undue adverse aesthetic impacts we cannot say Mr. Cunningham has an interest, particular to him, in the aesthetic character of the project site. We therefore conclude that Mr. Cunningham does not have standing in this appeal under Criterion 8. We do note that Mr. Cunningham testified at trial to the potential aesthetic impacts of the Project. This testimony was relevant and admissible whether he was testifying on his own behalf or as a witness for the other appellants and we fully considered it in rendering this decision.

## Conclusion

For the reasons discussed above, we conclude that the Project satisfies Criterion 1(D) as the Project will not restrict or divert the flow of flood waters, will not significantly increase the peak discharge of the river, and will not endanger the health, safety and welfare of the public or riparian owners during flooding. We conclude that the Project complies with Criterion 5 as the Project will not cause unreasonable congestion or unsafe conditions with respect to use of the highways or other means of transportation existing or proposed. Although we conclude that some of the Project's aesthetic impacts may be adverse to the character of the area, we also conclude that none of the aesthetic impacts will be "undue," and as such, the Project as proposed conforms to Act 250 Criterion 8. We condition our positive conclusion under Criterion 8 on the following conditions:

1. Applicants shall replace the faux windows at the front of the Project building with real windows.
2. Applicants shall replace the Amur Maples and Dwarf Rhododendron proposed in the landscaping plan with similarly functioning species that are native to Vermont.

We conclude that the Project complies with Criterion 10 because it does not conflict with any mandatory and unambiguous policies of the Town Plan. Lastly, we conclude that Mr. Cunningham does not have standing in this appeal under Criterion 8 because he has alleged no particularized interest protected by that Criterion.

A Judgment Order accompanies this Decision.  This completes the current proceedings before this Court.

Done at Berlin, Vermont, this 14 day of February, 2014.


_____

Thomas G. Walsh, Environmental Judge