STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT<br>Vermont Unit | ENVIRONMENTAL DIVISION<br>Docket No. 68-5-12 Vtec |
| Champlain Pkway A250 Permit | DECISION ON THE MERITS |

The City of Burlington (the City) and the State of Vermont Agency of Transportation (VTrans) (together, Applicants) seek an Act 250 permit for a project generally described as the completion and construction of the Champlain Parkway (the Parkway) in Burlington, Vermont. As proposed, the Parkway would connect Interstate 189 (I-189) to Burlington's South End and City Center District along a new roadway extending to Lakeside Avenue. The Parkway would also require the reconstruction of Lakeside Avenue and resurfacing and other improvements to Pine Street between Lakeside Avenue and Main Street. On April 27, 2012, the District 4 Environmental Commission (the Commission) issued Findings of Fact, Conclusions of Law, and an Order, which concluded that the project as proposed complies with all Act 250 criteria except Criteria 1(B) (wastewater) and 4 (erosion control). The Commission's Conclusions of Law and Order directed the City and VTrans to submit an application addressing these last two criteria once the project receives relevant stormwater permits. Several parties appealed the Commission's decision to this Court. During the pre-trial stages of this matter, Vermont Railway, Inc., Allan S. Hunt, and the Harlaine B. Miller Trust (formerly GP Burlington South, LLC) resolved their issues with the Parkway and withdrew their appeals. Fortieth Burlington, LLC (Fortieth) is the sole remaining appellant in this action.

In this appeal, we do not review whether the Parkway should be built. Furthermore, as established by Fortieth's appeal, our review is limited to Act 250 Criterion 5 (traffic), under which we do not have authority to deny a project.

A two-day merits hearing was conducted on February 11 and 13, 2014 at the Costello Courthouse in Burlington, Vermont. The parties asked the Judge to do a post-hearing site visit

1

which was completed the following week. Post-hearing filings were submitted March 14, 2014, with supplemental responsive memoranda filed March 28 and April 7, 2014.

Fortieth is represented by Carl H. Lisman, Esq. The City is represented by Brian S. Dunkiel, Esq. and Elizabeth H. Catlin, Esq. VTrans is represented by Daniel D. Dutcher, Esq.

Based upon the evidence at trial, including that which was put into context by the site visit, the Court renders the following findings of fact.

**Findings of Fact**

1. On April 15, 2011, the City and VTrans applied for an Act 250 permit for construction of the Parkway, a proposed two-lane divided street connecting I-189 in South Burlington (the I-189 Interchange) to Lakeside Avenue in Burlington, then following Lakeside Avenue east to Pine Street, and continuing north to terminate at Main Street in Burlington.

2. The current Parkway proposal is a substantially modified version of the Southern Connector, first permitted by the Commission under Act 250 in 1981.

3. Under the original Act 250 permit granted in 1981, the Southern Connector was permitted as a four-lane highway connecting I-189 and Shelburne Road to Battery and King Streets in Burlington.

4. Final plans for the first part of the Southern Connector were approved by a permit amendment in 1985, and several changes to the final plans were approved by permit amendments in 1987. The first and southernmost portion of the roadway was constructed in the late 1980s.

5. The Commission approved final plans for the second part of the Southern Connector in a permit amendment issued September 5, 1991. This portion of the Southern Connector was never built, however. Discovery of hazardous waste in the Pine Street Barge Canal and subsequent U.S. Environmental Protection Agency remediation efforts at the site halted further work on the project.

6. In the mid-2000s, a new project design emerged that significantly changed the Southern Connector as originally proposed. The design reduced the roadway from four to two lanes, abandoned the section that would have cut through the Pine Street Barge Canal,

2

and added pedestrian and bicycle transportation features. This modified plan is now known as the Champlain Parkway.

7. Despite the significant differences between the Southern Connector as originally proposed and the Parkway, the Act 250 permit that the City and VTrans currently seek for the Parkway is an amendment to the original permit granted in 1981.

8. On April 27, 2012, the Commission issued Findings of Fact, Conclusions of Law, and an Order, which concluded that the project as proposed complies with all but two Act 250 criteria, Criteria 1(B) and 4, as they relate to construction-phase stormwater.

9. The planning for and construction of the Parkway has been divided into three sections, grouped according to the areas with similar design characteristics and similar adjoining land uses.

   a. The southernmost section from the I-189 Interchange to Home Avenue, which was approved and constructed in the 1980s;

   b. The middle section from Home Avenue to Lakeside Avenue, which had previously received Act 250 approval but which was never constructed; and

   c. The northernmost section which follows existing roadways of Lakeside Avenue and Pine Street terminating at Main Street, which has never received final Act 250 approval.

10. The Parkway includes the following components:

   a. Reconstruction of the southernmost section of the Parkway to reduce the roadway width to accommodate two lanes of travel instead of four lanes and to transition from I-189 to a city street.

   b. Construction of a new roadway between Home Avenue and Lakeside Avenue for one lane of motorized vehicular travel in each direction with turn lanes and traffic signals at major intersections.

   c. Full-depth reconstruction of Lakeside Avenue from the intersection of the Parkway to Pine Street.

   d. Resurfacing of Pine Street.

   e. Construction of a new shared-use path in certain locations.

3

f. New and reconstructed sidewalks along the eastern side of Pine Street from Lakeside Avenue to Main Street, and along the western side of Pine Street from the terminus of the shared-use path to Main Street.

g. Exclusive pedestrian-activated phases for pedestrian crossings at all intersections with traffic signal control.

h. Replacement of four-way stop signs with new traffic signals at the intersections of Pine Street with Maple Street and Pine Street with King Street.

i. New stormwater management infrastructure in certain locations throughout the alignment to ensure that there will be no net loading of pollutants to the receiving waters as a result of the Parkway.

11. Generally, the Parkway is a scaled-down version of the previously approved traditional limited-access highway. The Parkway transitions from the I-189 Interchange area to a typical city street integrated with neighborhoods. The Parkway comprises two lanes, with additional third-lane turning lanes, and follows existing streets with no widening of the existing roadways. The Parkway also has increased pedestrian and cyclist accommodations from the previously approved design.

12. The Parkway itself is not a traffic generating project. The Parkway reassigns traffic from the existing street network to ease congestion and to allow through-traffic. Traffic on existing streets near the Parkway will generally decrease once the Parkway is constructed.

13. Traffic impacts from the Parkway include the following:

a. A reduction in the volume of through-traffic, including trucks, on Pine Street south of Lakeside Avenue and on local streets connecting Pine Street to Route 7.

b. An increase in overall mobility and improved access from the added circulation route.

c. Enhanced accommodations for non-vehicular travel modes.

d. An increase in traffic on the section of Lakeside Avenue from the Parkway intersection to Pine Street, and on Pine Street from Lakeside Avenue to Main Street.

14. Lakeside Avenue to the east and west of its intersection with the Parkway will be three lanes: one for traveling east, one for traveling west, and one turning lane. The turning

lane accommodates a left turn southbound onto the Parkway and a left turn to travel northbound on Pine Street.

15. The Parkway as it approaches its intersection with Lakeside Avenue has a left-turn/through lane for traffic turning left and traveling west on Lakeside Avenue or going straight into the Burlington Department of Public Works (DPW) access drive, as well as a right-turn lane for traveling east on Lakeside Avenue.

16. Pine Street in the area of its intersection with Lakeside Avenue will be three lanes: one for traveling south, one for traveling north, and one turning lane. The turning lane will accommodate southbound traffic turning right to travel west on Lakeside Avenue and northbound traffic turning left to travel west on Lakeside Avenue.

17. There are seven curb cuts on Lakeside Avenue between Pine Street and the railroad underpass to the west of Fortieth's property. On the north side of Lakeside Avenue, there are two curb cuts for DPW's property and two for Fortieth's property. On the south side of Lakeside Avenue, there is one curb cut for Cumberland Farms, one for the Champlain College office building, and one for the large parking lot now owned by the Harlaine B. Miller Trust.

18. The Parkway includes fully actuated coordinated traffic signals at the following intersections:
    a. Home Avenue and Flynn Avenue,
    b. Flynn Avenue and Sears Lane,
    c. Sears Lane and Lakeside Avenue,
    d. The Parkway and Lakeside Avenue, and
    e. Lakeside Avenue and Pine Street.

19. Fortieth's western driveway, DPW's east access, and the curb cuts for Cumberland Farms and Champlain College will not have signalization.

20. The signal at the Parkway and Lakeside Avenue intersection will include a separate dedicated phase for each of the following approaches: the Parkway, eastbound Lakeside Avenue, westbound Lakeside Avenue, DPW's driveway, and Fortieth's driveway. This will be an actuated signal, and as such, green-light phases are activated only when a vehicle approaches the intersection.

5

21. A shared-use path will be constructed along the north side of Lakeside Avenue. This will connect a shared-use path on the east side of the Parkway to on-road and off-road bicycle facilities on Pine Street.

22. A sidewalk currently on the north side of Lakeside Avenue will remain following construction of the Parkway.

23. Pedestrian and bicycle crosswalks will be located at the Parkway's intersection with Lakeside Avenue. These will cross both the Parkway and Lakeside Avenue.

24. The intersection of Lakeside Avenue with Pine Street will have a new fully-actuated traffic signal. All approaches to the intersection will have turning lanes.

25. A dedicated bicycle lane on Pine Street for southbound cyclists will be provided to reduce bicycle and vehicle competition for turning movements.

26. Side street and driveway curb-cuts on Lakeside Avenue and Pine Street will remain. Side streets are controlled by stop signs.

27. Fortieth is the owner of property at 128 Lakeside Avenue, located adjacent to and generally northwest of the intersection of the Parkway and Lakeside Avenue. This property has two buildings; one larger building located along the frontage of Lakeside Avenue and the second, known as Building 21, located at the northwest corner of the property.

28. Fortieth's property is bordered on the south by Lakeside Avenue, on the west by a railroad, on the east by the DPW, and on the north by the Barge Canal Superfund site.

29. The Burlington Electric Department (BED) is located on City property northeast of Fortieth's property.

30. Fortieth's buildings contain 217,000 square feet of first-class office space for commercial offices and medical uses. Tenants include the Veterans Administration, a pediatrician group practice, Fletcher Allen Healthcare, the University of Vermont, the Internal Revenue Service, and other office users. Building 21 is leased by Dealer.com.

31. Fortieth's property includes parking for approximately 720 vehicles. Parking is used by tenants of the property and additionally 104 parking spaces are leased to Dealer.com for parking by employees who work off-site at Dealer.com's Pine Street facility.

6

32. Fortieth's property has three access roads; two are currently in use and one is not currently in use.

33. A curb cut off of Lakeside Avenue is located to the west of Fortieth's main building (western driveway) and provides access to a parking lot on the west side of the building.

34. A second curb cut off of Lakeside Avenue is located to the east of Fortieth's main building (eastern driveway). The eastern driveway is approximately 24 feet wide, 12 feet wide to enter and 12 feet wide to exit, and provides the primary access to the main parking area. The curb cut for the eastern driveway is approximately 150 feet[1] west of the intersection of the Parkway with Lakeside Avenue. Some pedestrians will need to cross the eastern driveway when walking to/from their vehicles and the building.

35. The third access point is commonly referred to as the North Road and connects the east side of Fortieth's main parking area to Pine Street across the parcel of land occupied by the BED. This access is pursuant to a License Agreement with the City dated June 13, 1968. The City has blocked use of the North Road and it is therefore not currently in use.

36. Modifying the Parkway by adding travel/turning lanes or widening the road surface reduces green space.

37. The Parkway's green space, and tree plantings therein, affect the aesthetic experience of adjoining land owners and users.

38. Alteration of green space could also impact the handling and treatment of stormwater and require revisions to the operational stormwater permit.

39. Adding travel/turning lanes or widening the road surface would create wider vehicle travel patterns, making it more problematic to accommodate all modes of transportation, including pedestrian and bicycle crossings.

40. Traffic congestion is related to delay experienced by vehicles traveling on roadways and through intersections.

---

[1] We note that the prefiled testimony of Mr. Offei-Addo estimates this distance to be 100 feet.

7

41. Level of Service (LOS) is used to measure vehicle delay for signalized and un-signalized intersections as follows:

| LOS | Characteristics | Unsignalized Total Delay (Sec) | Signalized Total Delay (Sec) |
|-----|-----------------|-------------------------------|------------------------------|
| A | Little or no delay | ≤ 10.0 | ≤ 10.0 |
| B | Short delay | 10.0 – 15.0 | 10.1 – 20.0 |
| C | Average delay | 15.1 – 25.0 | 20.1 – 35.0 |
| D | Long delay | 25.1 – 35.0 | 35.1 – 55.0 |
| E | Very long delay | 35.1 – 50.0 | 55.1 – 80.0 |
| F | Extreme delays | > 50.0 | > 80.0 |

42. The Highway Capacity manual defines LOS as the quantitative stratification of a performance measure or measures that represents quality of service.

43. LOS is not a measure of safety.

44. The LOS or the amount of delay which is considered reasonable varies depending on the location or context of the travel area. A rural area will accept less delay than an urban area.

45. Roadways are not typically designed to provide LOS A, rather, a balance is struck between cost, environmental impact, and travelers' and society's desires.

46. The AM and PM peak hour for traffic are the 60-minutes within which most morning and evening commuting traffic occurs at an intersection. The traffic Design Hour is the 30th highest traffic volume for an hour at a specific location in a year.

47. Applicants used the Chittenden County Transportation Model (CCT Model), calibrated to the base year 1998, to calculate projected traffic volumes for the Parkway. The CCT Model is used for comprehensive regional transportation analyses and was developed by the Chittenden County Metropolitan Planning Organization (now the Chittenden County Regional Planning Organization).

48. Land use allocation was factored into Applicants' traffic calculations. The CCT Model does not account for traffic changes on a property-by-property or development-by-

development basis, however, it projects general growth trends based on existing land uses and projected changes in residential and commercial growth.

49. The traffic analysis for the Parkway assumed that the estimated time of construction for the Parkway would be 2008. Thus, the 20-year post construction year would have been 2028. The Parkway will not be constructed until later than 2014. Traffic calculations remain valid because the CCT Model predicted that traffic along Pine Street would grow 2.5 percent annually while actual traffic data shows that traffic is growing at a rate of less than 0.25 percent annually.

50. Currently, without the Parkway, the LOS for Fortieth's eastern driveway for both the AM and PM peak hours is LOS A.

51. The traffic light signalization on Lakeside Avenue controlling the Parkway, Fortieth's eastern driveway, DPW's western access, and Pine Street will operate on a cycle of 120 seconds during the AM peak hour and 150 seconds during the PM peak hour.

52. At the time of trial, the longest cycle time in Vermont for a signal controlled by the State is 130 seconds. Longer intersection cycle times may exist, however, the State does not control any.

53. If a pedestrian or bicyclist triggers the walk signal at any Lakeside Avenue intersection, a 23 second period will be available at the end of each cycle; if no pedestrian requests walking time, the 23 seconds will be added to the primary route (onto and off from the Parkway) green time.

54. During the cycle, each controlled intersection will have dedicated periods of green, yellow, and red time. Yellow time will be four seconds and red time will be at least one second.

55. Fortieth's eastern driveway exit is allocated eight seconds of green signal in the AM peak hour and 26 seconds in the PM peak hour.

56. Following Parkway construction, it is projected that the LOS for Fortieth's eastern driveway will decrease from LOS A to LOS E (very long delays) in the AM peak hour and LOS F (extreme delays) in the PM peak hour with delays of 55.3 seconds and 114 seconds.

9

57. The wait for vehicles may result in a queue length of 500 feet. Vehicles may be required to wait through a number of light cycles before they can drive through the intersection.

58. Daily traffic on Lakeside Avenue is presently estimated at approximately 2,900 vehicles per day. With the Parkway, traffic levels are projected to increase to 6,200 vehicles per day.

59. VTrans' policy is to design roadways and highways to maintain a LOS C for the prescribed design period. For densely settled areas, the Secretary of Transportation may, on a case-by-case basis, approve a reduced LOS. Safety and mobility of the traveling public is protected.

60. If the Parkway is constructed, the Applicants will be responsible for field implementation and optimization of the Parkway.

61. While the Parkway project is presently designed with specific intersections and cycle time allocations for all turning movements through the intersections, the Applicants are responsible for implementing traffic controls and retains the ability to adjust or modify intersection cycle time and green light time allocation to all turning movements.

62. At times, the City modifies signal patterns in advance of special events.

**Conclusions of Law**

The questions presented in this appeal (Fortieth's questions) are summarized as follows:

1. Whether the Parkway will cause unreasonable congestion or unsafe conditions for automobile and truck traffic or pedestrian and bicycle traffic;
   a. on Lakeside Avenue;
   b. at the eastern driveway accessing Fortieth's property;
   c. at the intersection of Lakeside Avenue and the Parkway;
   d. at the intersection of Lakeside Avenue and Pine Street;
   e. on Lakeside Avenue in light of the Champlain College office building and associated parking lot;
   f. on Lakeside Avenue at the entrance of GP Burlington South, LLC (now the Harlaine B. Miller Trust) property;
   g. at the western driveway accessing Fortieth's property; or
   h. on Lakeside Avenue, Sears Lane, and Pine Street?

2. Does the City's evidence fail to show that the Parkway will not cause unreasonable congestion and unsafe conditions with respect to traffic:
   a. on Lakeside Avenue;

      b. at the intersection of Lakeside Avenue and Pine Street; or

      c. at the intersection of Lakeside Avenue and the Parkway?

3. Should the Court require construction of twin left-turn lanes on the east-bound side of Lakeside Avenue at the intersection with Pine Street,
      a. to reduce congestion and delay,
      b. to prevent unsafe traffic?

4. Should the Court require construction of twin left-turn lanes on the west-bound side of Lakeside Avenue at the intersection with the Parkway,
      a. to reduce congestion and delay,
      b. to prevent unsafe traffic?

5. Should the Court require as a condition of the Project that the City move the easterly driveway accessing the Fortieth property to directly across Lakeside Avenue from Champlain Parkway to reduce congestion and improve the safety of the intersection of Lakeside Avenue and the Parkway?

6. Should the Court require as a condition of the Project that the City construct a traffic signal at the intersection of Lakeside Avenue with the proposed relocated access to GP Burlington South, LLC (now the Harlaine B. Miller Trust) property and the westerly driveway for Fortieth property, to reduce the degree of congestion and delay and to prevent unsafe traffic?

7. Should the Court require as a condition of the Project that the City provide access between the Fortieth property and Pine Street over the so-called North Road?

## Standard of Review and Burden of Proof

Fortieth's questions relate to Act 250 Criterion 5 which requires that a development "[w]ill not cause unreasonable congestion or unsafe conditions with respect to use of the highways, waterways, railways, airports and airways, and other means of transportation existing or proposed." 10 V.S.A. § 6086(a)(5). We cannot deny a permit "for a project that creates unsafe conditions within the meaning of [C]riterion 5, but permit conditions can be imposed to remedy those conditions." In re Agency of Transp., 157 Vt. 203, 207 (1991) (citing 10 V.S.A. § 6087(b)). An opponent to a proposed development carries the burden of proof under Criterion 5 to show that the proposed development will cause "an unreasonable or adverse effect." 10 V.S.A. § 6088(b). The applicant, however, must produce sufficient evidence for us to make positive findings. Id.; see In re Route 103 Quarry, No. 205-10-05 Vtec, slip op. at

8 (Vt. Envtl. Ct. Nov. 22, 2006) (Durkin, J.) (stating that § 6088(b) pertains only to the burden of persuasion and that the "applicant always carries the initial burden of production").

In reviewing a project under Criterion 5, we consider its impact on the use of highways, including whether the project may exacerbate already congested or unsafe traffic conditions. In re Pilgrim P'ship, 153 Vt. 594, 596–97 (1990). When a project creates unreasonable congestion or unsafe conditions or exacerbates preexisting unreasonable congestion or unsafe conditions, we may impose conditions to alleviate the congestion and unsafe conditions. Id. Fortieth's questions address only the area around the intersections of the Parkway, Lakeside Avenue, and Pine Street, including the driveways to the properties west of the Parkway's intersection with Lakeside Avenue. The Parkway itself is not a traffic generating project. Rather, the Parkway is intended to reassign traffic from the existing street network to ease congestion and to allow through-traffic to avoid neighborhood streets.

Among Applicants' evidence regarding the existing and expected traffic conditions are a detailed traffic and safety analytical report and testimony of Mr. David Kahlbaugh, a traffic engineer. Regarding Fortieth's Question 2, whether Applicants' evidence is sufficient to show the Parkway will not cause unreasonable congestion or unsafe conditions, we find the report and testimony credible and sufficient evidence of existing and expected traffic conditions. We therefore conclude that Applicants satisfied their burden of production for us to make positive findings under Criterion 5.

Fortieth asserts that Applicants' traffic study fails to account for recent or future development on Lakeside Avenue such as Champlain College's new office building, fails to account for certain turning movements at DPW and Cumberland Farms curb cuts, fails to account for the change in occupancy of Fortieth's property, and lacks any current analysis of Fortieth's entrances to Lakeside Avenue. In support of its assertions, Fortieth introduced into evidence testimony of its own traffic engineer, Samuel Offei-Addo, and testimony of Mr. Charles Bayer, a member and the manager of Fortieth, both of whom disagreed with certain conclusions of Applicants' traffic study. While we agree that Applicants' traffic study may not have specifically accounted for certain recent development and changes in use of property in the area of the intersections at issue in this appeal, the CCT Model overestimated the growth

12

rates in the area. We therefore conclude that the CCT Model's overestimates are more than enough to offset the recent development and land use changes.

**Congestion and Unsafe Conditions**

As described in the findings of fact and discussion above, much of the evidence before the Court is based upon predictive traffic models. Presently, vehicles exiting Fortieth's property experience no wait or delays of up to several seconds. The intersection of Fortieth's eastern driveway with Lakeside Avenue currently experiences a Level of Service (LOS) A during the AM peak hour and LOS B during the PM peak hour. Following construction with the Parkway in use, Fortieth's eastern exit onto Lakeside Avenue will be signalized. Fortieth's exit is projected to operate at LOS E and LOS F with delays of 55.3 seconds and 114 seconds during the AM and PM peak hours.[2] "[A] LOS below C is generally inconsistent with Criterion 5." Re: Okemo Ltd. Liability Co., et al., No. 2S0351-34-EB, Findings of Fact, Conclusions of Law, and Order, at 10 (Vt. Envtl. Bd. Sept. 8, 2005). Moreover, VTrans' policy is to design roadways and highways to maintain a LOS C for the prescribed design period, although lower levels of service may be permitted on a case-by-case basis. Therefore, in answering Fortieth's Question 1, we conclude that if these predicted delays are realized, the traffic attempting to exit Fortieth's property may experience unreasonable congestion.

We also conclude that the Parkway may result in unsafe conditions with respect to vehicles exiting Fortieth's property during heavy traffic times. Specifically, drivers experiencing long waits may adopt a 'go for it' attitude when the light is yellow or red, resulting in unsafe exits onto Lakeside Avenue. Longer queuing on Fortieth's eastern access drive may also result in unsafe conditions with pedestrians crossing between vehicles in the queue line.

Fortieth suggested alterations to the Parkway to mitigate potential traffic congestion and safety impacts. These alterations include: (1) incorporating double left-turn lanes on Lakeside Avenue combined with a shortened green signal time for movements on Pine Street and Lakeside Avenue and an increased green signal time for Fortieth's eastern exit[3]; (2) allowing an additional exit from Fortieth's property through the so-called North Road to Pine

---

[2] Applicants' traffic engineer initially calculated PM peak hour delay times of 95.1 seconds, assuming that the width of Fortieth's exit was 16 feet. The exit is only 12 feet wide, and therefore, delays may be 114 seconds.

[3] Fortieth would like between 31 and 43 seconds of green signal time for its exit.

Street; (3) redesigning the intersection of the Parkway and Lakeside Avenue to be a four-way rather than a five-way intersection whereby Fortieth's access way would be relocated to the east and shared with DPW's access way; and (4) combining DPW and Fortieth's green signal time.

The proposed alterations present a number of potential challenges and drawbacks. Incorporating double left-turn lanes would require additional available space or the creation of new space for the additional turning and receiving lane(s). If the roadway is widened, green space would correspondingly be reduced. Green space and tree plantings therein impact the adjoining land owners' and users' experience with the Parkway. Alteration of green space could also impact the handling and treatment of stormwater and require revisions to the operational stormwater permit. Finally, adding lanes would create wider vehicle travel patterns, making it more problematic to accommodate all modes of transportation, including pedestrian and bicycle crossings. We therefore decline to condition the Parkway to require additional turning lanes.

The proposed exit across the so-called North Road may impact BED traffic on its property as well as Pine Street traffic which would experience a much greater volume of traffic entering directly on to Pine Street. We will not, therefore, require the City to allow Fortieth to use the North Road to provide direct access to Pine Street from its parking area.

Lastly, although Fortieth advanced the theoretical improvements of redesigning the Parkway and Lakeside Avenue intersection, combining DPW and Fortieth's green signal time, it did not provide necessary details of each improvement or the corresponding impacts on traffic. We therefore reject these proposed conditions.

In response to Fortieth's concerns regarding delays for traffic exiting its property, the City suggested requiring Fortieth to use its western access for exiting rather than the eastern access. This Court does not have jurisdiction to impose a condition on property which is not under Applicants' control absent an agreement from the party that owns or controls that other property (here, Fortieth). See Re: TOFR Bayside Associates, No. DR-158, Findings of Fact, Conclusions of Law and Order, at 3 (Vt. Envtl. Bd. Sept. 26, 1984) (noting that Act 250 review "only attaches to those lands owned or controlled by the permit applicant(s)," and that the District Commission's conditions on property under separate ownership and control were

14

therefore not binding on that property). Fortieth opposes the City's proposed condition and there is no evidence before us of Applicants initiating or undertaking any condemnation proceedings. Therefore, we do not consider the merit of this proposed alteration.

The Parkway has been designed and modified based upon experience and engineered calculations with the aid of predictive modeling. The sections of the Parkway under review in this matter involve many-faceted interactions with multiple turning movements, several travel directions, signaled and unsignaled intersections, and several curb cuts and driveways, all serving vehicular, truck, bicycle, and pedestrian transportation. Changing one aspect of the Parkway, including but not limited to adding a travel lane(s), modifying signal durations/cycles, adding new property access/exits, or requiring specific traffic movements, may create unknown or unexpected consequences in other aspects of the transportation system.

Applicants assert that the Parkway will not result in unreasonable congestion or unsafe conditions. Fortieth credibly argues that the Parkway will result in unreasonable congestion and unsafe conditions at its eastern exit from its property onto Lakeside Avenue. Our implementation of Act 250 is a continual balance between competing interests. See In re Village Associates, 2010 VT 42A, ¶ 17, 188 Vt. 113 (noting that the "goals of Act 250 have always been balanced against the economic necessity of development . . . [resulting in] a practical approach to regulation"). While the Parkway may generally provide an overall ease to present traffic congestion and enhance through-traffic commuting, we must be careful to protect against unreasonable congestion and unsafe conditions at any location.

Based upon the evidence before the Court, rather than modifying the design or altering the proposed Parkway, we impose the conditions set forth in the Conclusion below requiring monitoring and reporting, as well as a right of action based upon evidence that the Parkway is creating unreasonable congestion or unsafe traffic conditions. We therefore answer Fortieth's questions 3, 4, 5, 6, and 7 in the negative.

While the Parkway is presently designed with specific intersection configurations and cycle time allocations for all turning movements, the Applicants are responsible for implementation of traffic controls and retain the ability to adjust or modify intersection cycle time and green time allocation for all turning movements. Neither the Commission's approval nor this Decision condition or restrict the Applicants' ability to adjust cycle times. Imposing

15

specific cycle time conditions would impede the Applicants' ability to meet the obligations to promptly review traffic congestion or safety issues and timely implement necessary remedies.

## Conclusion

Based upon the above findings of fact, and for the reasons discussed above, we conclude that the Champlain Parkway may cause unreasonable congestion or unsafe conditions with respect to use of the highways. While we cannot deny a permit for a project that creates unreasonable congestion or unsafe conditions within the meaning of Criterion 5, we may impose permit conditions to remedy those conditions. 10 V.S.A. § 6086(a)(5). We therefore impose the following conditions:

1. Monitoring – Using standard industry practices, Applicants shall perform traffic studies and signal warrant analysis to monitor traffic congestion and safety issues relating to automobile and truck traffic and pedestrian and bicycle traffic at the following locations:

    a. Lakeside Avenue,

    b. The eastern driveway entering and exiting the Fortieth property,

    c. The western driveway entering and exiting the Fortieth property,

    d. The intersection of Lakeside Avenue and the Parkway, and

    e. The intersection of Lakeside Avenue and Pine Street.

    Monitoring shall be conducted semi-annually during the first year that the Parkway is in use and annually for years 2 and 3 of Parkway use.

2. Reporting – Within 30 days of each study/monitoring episode, Applicants shall finalize a written report detailing the monitoring efforts and the results.

3. Notice and service – Copies of each written report shall be filed with the Commission and served on Fortieth. Reports shall be filed and served within 5 days of the deadline noted in number 2 above.

4. Resolution – Parties are directed to work in good faith to resolve any traffic congestion and safety issues.

5. Petition to Commission – If resolution is not obtained through the parties' best efforts, an individual or entity retaining party status in this matter may timely petition the Commission to reopen its consideration of the application currently before the Court,

limited to the Statement of Questions considered in this Decision. The deadline to file a petition shall be 60 days from the date of receipt of a final written traffic report noted in number 3 above.

6. Appeal to Environmental Division – Following any decision of the Commission, an appeal may be filed with this Court pursuant to 10 V.S.A. Chapter 220.

This matter is remanded to the Commission. At the time of this appeal, the Commission had not yet issued an Act 250 land use permit as it was awaiting stormwater permits to enable it to find compliance with Criteria 1(B) and 4. If and when appropriate, the Commission is directed to issue a land use permit setting forth the above conditions. Additionally, as jurisdiction is now returned to the Commission, pursuant to the above conditions, it may consider a timely petition to review the application pursuant to Condition 5 above.

A Judgment Order accompanies this Decision. This completes the current proceedings before this Court.

Electronically signed on July 30, 2014 at 02:57 PM pursuant to V.R.E.F. 7(d).

_____
Thomas G. Walsh, Judge
Superior Court, Environmental Division